# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK
_____

**DARREN BARCOMB,**

                    **Plaintiff,**                    **8:07-cv-877**
                                                      **(GLS/DRH)**

          **v.**

**ARLENE SABO,** et al.,

                    **Defendants.**
_____

**APPEARANCES:**                    **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Ruchelman, Cruikshank Law Firm          ALLAN B. CRUIKSHANK, JR.,
49 Clinton Street                        ESQ.
Plattsburgh, NY 12901

Office of Bethany Schumann-McGhee       BETHANY SCHUMANN-
2465 Riverfront Center                   MCGHEE, ESQ.
Amsterdam, NY 12010

Office of Elmer R. Keach, III           ELMER R. KEACH, III, ESQ.
1040 Riverfront Center
P.O. Box 70
Amsterdam, NY 12010

**FOR THE DEFENDANTS:**
HON. ERIC T. SCHNEIDERMAN              MICHAEL G. MCCARTIN
New York State Attorney General        Assistant Attorney General
The Capitol
Albany, NY 12224

**Gary L. Sharpe**
**District Court Judge**
          <u>**MEMORANDUM-DECISION AND ORDER**</u>

## I. Introduction

Plaintiff Darren Barcomb, a police officer for the State University of New York (SUNY) at Plattsburgh, commenced this action pursuant to 42 U.S.C. § 1983 against defendants Arlene Sabo, Chief of Police at SUNY Plattsburgh, Jerry Lottie, the Assistant Chief of Police at SUNY Plattsburgh, and New York State Trooper Shawn Murphy,[1] alleging federal claims of false arrest, malicious prosecution, unreasonable seizure, unlawful retaliation, due process violations, and failure to supervise. (*See* Am. Compl., Dkt. No. 19.)   Pending is defendants' motion for summary judgment. (Dkt. No. 94.)  For the reasons that follow, the motion is granted.

## II. Background

### A.    2005 Events

Since 1999, plaintiff Darren Barcomb has worked as a police officer for SUNY Plattsburgh under the supervision of defendants Arlene Sabo, Chief of Police at SUNY Plattsburgh, and Jerry Lottie, Assistant Chief of

---

[1]While Barcomb also sued William Laundry, a SUNY Plattsburgh Vice President, Lawrence Mills, the SUNY Plattsburgh Director of Human Relations, and retired New York State Trooper Mary Dupell, he has since agreed to dismiss all claims against those individuals. (*See* Nov. 12, 2010 Stipulation & Order of Discontinuance, Dkt. No. 116.)

Police.  (*See* Am. Compl. ¶ 16, Dkt. No. 19; Defs. SMF ¶¶ 1, 2, Dkt. No. 94:71.)

On June 27, 2005, a member of the Suffolk County Police Department notified the SUNY Plattsburgh Police Department that Barcomb's former girlfriend, Cindy Bednar, filed a criminal complaint against Barcomb for second-degree menacing with a weapon.  (*See* Am. Compl. ¶ 17, Dkt. No. 19; Defs. SMF ¶ 9, Dkt. No. 94:71.)  According to Ms. Bednar, Barcomb put a gun to her head and said,  "You're not f***ing leaving.  I'm gonna kill you." (Defs. SMF ¶ 25, Dkt. No. 94:71.)  Given the nature of this allegation, an Order of Protection was issued, requiring Barcomb to immediately surrender all firearms.  (*See id.* at ¶ 26.)

In light of Ms. Bednar's complaint, Barcomb was placed on desk duty and his firearm was secured from his police locker.  (*See id.* at ¶ 11.)  In addition, on June 29, after consulting with the SUNY Plattsburgh Human Resources Department, Chief Sabo placed Barcomb on administrative leave with pay.  (*See id.* at ¶ 13.)

On June 30, Chief Sabo received from Suffolk County Detective Robert Cassidy a facsimile transmission of a warrant for the arrest of Barcomb on the misdemeanor charges of menacing in the second degree

3

with a weapon, a violation of New York Penal Law § 120.14(1).  (*Id.* at ¶ 16.)  The warrant, which was signed on June 28 by a judge of the District Court of the County of Suffolk, stated: "This warrant may be executed at anytime and anywhere in the State of New York."  (*Id.* at ¶¶ 18, 19.)  The warrant was also forwarded to the Suffolk County Police Department's Fugitive Section, which is responsible for executing warrants outside of the Department's local jurisdiction.  (*See id.* at ¶ 20; Pl. Counter SMF ¶ 2, Dkt. No. 109.)  The Fugitive Section mailed a letter to Barcomb, advising him of the warrant and that its execution would be held in abeyance for five days.  (*See* Defs. SMF ¶ 20, Dkt. No. 9471; Pl. Counter SMF ¶ 3, Dkt. No. 109.)  However, Chief Sabo, Assistant Chief Lottie, and Detective Cassidy were not aware of this letter or the abeyance until after this litigation was commenced, (*see* Defs. SMF ¶ 20, Dkt. No. 94:71), and Barcomb did not learn of it until days after it was sent, (*see* Defs. Resp. SMF ¶ 3, Dkt. No. 112:2).

Later the same day, June 30, Chief Sabo called Barcomb to the SUNY Plattsburgh Police Station for a meeting.  (*See* Pl. Counter SMF ¶ 9, Dkt. No. 109.)  During the meeting, Chief Sabo and Assistant Chief Lottie informed Barcomb of the arrest warrant pending against him.  (*See id.* at ¶

4

12; Defs. Resp. SMF ¶ 12, Dkt. No. 112:2.)  According to Barcomb, he

asked whether he could turn himself in by immediately driving to Long

Island, to which Chief Sabo responded, "no, not an option."  (*See* Pl.

Counter SMF ¶ 13, Dkt. No. 109.)  Rather, Barcomb claims that "Chief

Sabo and Assistant Chief Lottie told [him] that either they could take him

down to Long Island, or [he] could be shackled and taken down, as

Assistant Chief Lottie put it, 'the hard way by the [S]tate [T]roopers.'"  (*Id.*

at ¶ 17.)  According to Chief Sabo and Assistant Chief Lottie, they "felt

obligated to be the SUNY personnel to drive him because they were

concerned about "'what [Barcomb] would do in the meantime.'"  (*See id.* at

¶ 15.)

Barcomb also contends that he "requested to be arraigned locally

before ... a judge of the Plattsburgh City Court, instead of any of the other

options that Chief Sabo put forth."  (*Id.* at ¶ 18.)  According to Barcomb,

however, "Chief Sabo ignored [his] plea, telling him 'no, you don't want

that.'"  (*Id.*)  Ultimately, Barcomb agreed to be taken to Long Island by

Chief Sabo, but "maintain[s] that he felt obligated to [do so] because it was

a direct order, and if he didn't obey, he would be written up and charged

with insubordination."  (*Id.* at ¶ 19.)  Thus, at approximately 3:00 p.m on

5

June 30, Chief Sabo and Assistant Chief Lottie left the SUNY station with Barcomb and headed to Long Island.  (*See id.* at ¶ 20.)  Approximately seven hours later, after driving 350 miles, the three arrived at the Suffolk County Police Station, where Barcomb was taken into custody by the Suffolk County Police and ultimately held overnight in Suffolk County Jail.  (*See id.* at ¶¶ 35, 36, 37.)

Barcomb was arraigned and released the next day, July 1, at approximately 12:00 p.m.  (*See* Defs. Reply Mem. of Law at 4, Dkt. No. 112.)  Barcomb claims that Chief Sabo told him before he was locked up that she and Assistant Chief Lottie would be in the courthouse for his arraignment.  (*See* Pl. Counter SMF ¶ 39, Dkt. No. 109.)  Barcomb further contends that Chief Sabo provided him with her cell phone number so that he could call her and Assistant Lottie when his arraignment was over and ride back with them to Plattsburgh.  (*See id.* at ¶ 39.)  However, after his arraignment, Barcomb was unable to locate Chief Sabo or Assistant Chief Lottie in the courthouse, and, after calling Chief Sabo's cell phone, was told by Chief Sabo that "she and Assistant Chief Lottie had already left the city, and were past the bridge."  (*Id.* at ¶ 41.)  Chief Sabo ended the conversation by telling Barcomb, "good luck on getting home."  (*Id.* at ¶ 42.)

As a result, Barcomb claims, he was forced to buy an airplane ticket for a flight from New York City to Burlington, Vermont.  (*Id.* at ¶ 43.)

On July 8, based on his arrest and inability to carry a firearm, Barcomb was formally suspended without pay from the SUNY Plattsburgh Police Department, pending the outcome of a disciplinary arbitration hearing.[2]  (*See* Defs. SMF ¶ 28, Dkt. No. 94:71; Pl. Counter SMF ¶ 45, Dkt. No. 109.)  Barcomb was also required at some point in July to surrender his SUNY Police ID and badge.  (*See* Defs. SMF ¶ 30, Dkt. No. 94:71.) And on July 29, a formal Notice of Discipline letter was issued to Barcomb by the SUNY Plattsburgh Human Resources Director Lawrence Mills, which detailed the disciplinary charges against him.  (*See id.* at ¶ 29.)

After receiving the 2005 Notice of Discipline, Barcomb applied for unemployment benefits through the New York Department of Labor (DOL). (*See* Pl. Counter SMF ¶ 45, Dkt. No. 109.)  In investigating Barcomb's application, the DOL sent to the Human Resources Department of SUNY Plattsburgh a form requesting information pertaining to Barcomb's employment status.  (*See id.* at ¶ 47.)  In response to the inquiry, Lawrence

_____

[2]"It was SUNY's contention that among the regular requirements to be a SUNY Plattsburgh Police Officer I, the position Barcomb held, was the requirement that he be equipped with a firearm while on duty."  (Defs. SMF ¶ 27, Dkt. No. 94:71.)

Mills stated that Barcomb "remained on our payroll but that he was suspended." (*Id.* at ¶ 48.) Mr. Mills then wrote to Maria Zalewska of the DOL, stating that "it's my understanding that since he remains our employee while on suspension, he would be ineligible for benefits from your agency until ... his disciplinary case is heard and a determination is made that termination is appropriate." (*Id.* at ¶ 49.)

## B.   **2006 Events**

On January 1, 2006, between 1:30 a.m. and 2:00 a.m., Barcomb, driving alone in his vehicle, approached a sobriety road checkpoint on State Route 22 in the Town of Plattsburgh. (*See* Defs. SMF ¶ 37, Dkt. No. 94:71.) Upon observing that Barcomb's eyes appeared abnormally dilated, New York State Trooper Shawn Murphy, the officer assigned to the checkpoint, directed Barcomb to pull to the side of the road. (*See id.* at ¶ 38.)[3] Once Barcomb had pulled over, Trooper Murphy approached Barcomb's vehicle and asked for Barcomb's driver's license and vehicle registration. (*See* Murphy Decl. ¶ 10, Dkt. No. 94:35.) According to

---

[3]As part of his training with the New York State Police, Trooper Murphy learned to recognize individuals who are under the influence of illegal drugs, and was certified by the North American Highway Traffic & Safety Administration as a drug recognition evaluation expert. (*See* Defs. SMF ¶ 39, Dkt. No. 94:71.) Based on that training, Trooper Murphy knows, for instance, that marijuana use or the use of certain other illegal drugs causes pupil dilation. (*See id.* at ¶¶ 39-41.)

8

Trooper Murphy, Barcomb handed him his license and stated, "I'm on the job," which Trooper Murphy claims he understood as "conveying ... that [Barcomb] was actively worked as a police officer." (*Id.*)  Barcomb denies ever saying he was "on the job." (Pl. Resp. SMF ¶ 67, Dkt. No. 109.)

Trooper Murphy told Barcomb that he pulled him over because his pupils were dilated,[4] and asked Barcomb whether he was taking any medications that would cause his pupils to dilate.  (*See* Murphy Decl. ¶ 12, Dkt. No. 94:35.)  In response, Barcomb told Trooper Murphy that he "was on thyroid medicine." (Defs. SMF ¶ 44, Dkt. No. 94:71.)

At some point during his encounter with Barcomb, Trooper Murphy told Barcomb that he was going to administer the "Horizontal Gaze Nystagmus" sobriety test.  (*See id.* at ¶ 45.)  When Trooper Murphy began to explain the test, Barcomb stated "I understand how it works, I have been a cop for six years." (*Id.*)  After Barcomb made that statement, Trooper Murphy asked him where he worked, and Barcomb responded "... at SUNY Plattsburgh, but I have spent some time at SUNY Stony [B]rook." (*See id.* at ¶ 49; Murphy Decl. ¶ 11, Dkt. No. 94:35.)  And when

---

[4]Barcomb testified at his deposition that Trooper Murphy told him that his "eyes looked a little funny to him." (Defs. SMF ¶ 43, Dkt. No. 94:71.)

asked if he had any identification or a badge, Barcomb claims he stated, "I don't have any. I'm out of work at the moment." (Defs. SMF ¶ 51, Dkt. No. 94:71.)  Barcomb did not specify that he was suspended, (*see id.*), and Trooper Murphy denies that Barcomb told him he was "out of work," (*see* Defs. Mem. of Law at 16, Dkt. No. 94:72).

At one point during their exchange, Trooper Murphy saw an identification card in Barcomb's wallet.  (Defs. SMF ¶ 52, Dkt. No. 94:71.) According to Barcomb, it was "a faculty staff library card from Stony [B]rook, and it said State of New York or SUNY or some kind of a state designation on the top." (*Id.*)  When Trooper Murphy asked what the card was, Barcomb responded that it was "his old SUNY card from SUNY Stony [B]rook, but I'm not there anymore.  I transferred back here in April." (*Id.* at ¶ 55.)  Defendants claim that the ID card in question depicted Barcomb in his police uniform with a "walkie talkie" clipped to his shoulder, and did not indicate that it was a library card. (*See id.* at ¶¶ 53-54.)  Trooper Murphy did not require Barcomb to hand him the card, nor did he examine it any further, telling Barcomb that he did not need to see it as Barcomb began to remove it from his wallet.  (*See id.* at ¶ 56.)

Ultimately, Trooper Murphy permitted Barcomb to leave without

undergoing a sobriety test.  (*See id.* at ¶ 59.)  According to Trooper

Murphy, he believed that Barcomb was in fact a SUNY Police Officer—and

therefore a trustworthy person—and that Barcomb's representation that the

thyroid medication was the reason for the pupil dilation was truthful.  (*See

id.* at ¶¶ 56-57, 59.)  Trooper Murphy also testified to observing no other

signs of impairment.  According to Trooper Murphy, Barcomb did not

appear intoxicated by alcohol, and neither Barcomb nor his vehicle emitted

any odors warranting further suspicion.  (*See id.* at ¶ 58.)  For these

reasons, Trooper Murphy concluded that requiring Barcomb to exit his

vehicle and take a full-blown drug recognition evaluation was unnecessary,

ultimately telling him: "Okay, have a good night .... You know how it is, just

checking for drunks."  (*Id.*  at ¶¶ 59, 60 (internal quotation marks omitted);

Defs. Resp. SMF ¶ 64, Dkt. No. 112:2.)

Several days later, while at a training session in Albany, New York,

Trooper Murphy discussed the incident with SUNY Plattsburgh Police

investigator Seth Silver, and learned that Barcomb was suspended from

the SUNY Plattsburgh Police Department at the time of the checkpoint

stop.  (Defs. SMF ¶ 61, Dkt. No. 94:71.)  Based on this information,

Trooper Murphy claims to have become suspicious of the representations

made to him by Barcomb during their encounter.  (*See id.* at ¶¶ 61-63.)  In line with that suspicion, Trooper Murphy claims he spoke with his wife, a registered nurse, about whether thyroid medication would cause an individual's pupils to dilate.  (*See id.* at ¶ 62.)  According to Trooper Murphy, his wife told him that thyroid medication would not have that effect. (*See id.*)

On January 26, while at a domestic violence training session, Trooper Murphy's Zone Sergeant, Sgt. Mary Dupell, was approached by Chief Sabo about the checkpoint incident.  (*See id.* at ¶¶ 64-65; Dupell Decl. ¶ 5, Dkt. No. 94:22.)  According to Sgt. Dupell, Chief Sabo told her that Investigator Silver had learned from Trooper Murphy that Barcomb was involved in a checkpoint stop, during which Barcomb stated that he was "on the job." (*See* Dupell Decl. ¶ 5, Dkt. No. 94:22.)  Chief Sabo also relayed the fact that although Barcomb indicated he was a police officer "in good standing in New York State," he had actually been suspended from the SUNY Plattsburgh Police since early 2005.  (*Id.*; Pl. Counter SMF ¶ 75, Dkt. No. 109.)  According to Sgt. Dupell, she "recall[s] asking Chief Sabo what she wanted done about it, and [Chief Sabo] said something like, 'whatever the law would allow to be done,' or words to that effect."  (*Id.*)

12

The next day, Sgt. Dupell spoke with Trooper Murphy about the checkpoint incident.  (*See id.* at ¶ 6.)  During their discussion, Sgt. Dupell was given the following account: (1) on January 1, 2006, Trooper Murphy was working at a sobriety road check in the Town of Plattsburgh on State Route 22; (2) Barcomb drove up to the checkpoint and Trooper Murphy noticed that he had dilated pupils; (3) Barcomb told Trooper Murphy that he was "on the job"; (4) when Trooper Murphy asked Barcomb whether he was taking any medication that would cause his eyes to be dilated, Barcomb told him that he was taking medication for thyroid problems; and (5) there were no signs of alcohol use by Barcomb at the checkpoint.  (*See* Defs. SMF ¶ 66, Dkt. No. 94:71.)

On January 31, following her conversation with Trooper Murphy,  Sgt. Dupell contacted First Assistant District Attorney (FADA) Kristy Sprague from the Clinton County District Attorney's Office to determine whether the events that occurred during the January 1 checkpoint stop—as they were relayed to her by Trooper Murphy—provided probable cause to arrest Barcomb for criminal impersonation.  (*See* Defs. SMF ¶¶ 65, 66, Dkt. No. 94:71.)  Later that same day, after researching the issue and speaking with her boss, District Attorney (DA) Andrew Wylie, FADA Sprague emailed Sgt.

Dupell, stating that "we agree that this person could be charged with Criminal Impersonation 2nd Degree pursuant to [N.Y. Penal Law] 190.25(3),"[5] and that "[a]s for whether this office would entertain a charge or arrest for Criminal Impersonation 2nd Degree (PL 109.25 (3)) - Yes, we will." (Dupell Decl. ¶ 17, Dkt. No. 94:22.)  On February 2, 2006, Sgt. Dupell forwarded this entire email exchange to Trooper Murphy.  (*Id.* at 18.)

Over the next several weeks, Sgt. Dupell and FADA Sprague exchanged numerous emails with respect to Barcomb's potential arrest and prosecution.  (*See* Defs. SMF ¶ 68, Dkt. No. 94:71.)  In those emails, Sgt. Dupell relayed further facts related to the checkpoint stop, and FADA Sprague provided legal advice to the State Police.  (*See id.*)  The additional facts relayed to FADA Sprague included a clarification that Barcomb showed an old Stony Brook Police ID—not a "badge"—which Sgt. DuPell likened to the IDs carried by members of the State Police, explaining it as "an actual photo identification that displays ... rank in addition to the usual

_____

[5]Under N.Y. PENAL LAW § 190.25(3), "A person is guilty of criminal impersonation in the second degree when he:... (a) [p]retends to be a public servant, or wears or displays without authority any uniform, badge, insignia or facsimile thereof by which such public servant is lawfully distinguished, or falsely expresses by his words or actions that he is a public servant or is acting with approval or authority of a public agency or department; and (b) so acts with intent to induce another to submit to such pretended official authority, to solicit funds or to otherwise cause another to act in reliance upon that pretense."

agency ID, member name, and certifying signatures." (*See* PI Counter

SMF ¶ 80, 81, Dkt. No. 109.)

With respect to the legal advice provided, it appears that much of the

dialogue related to whether Barcomb was still a "police officer" while on

suspension. (*See* DuPell Decl. ¶¶ 20-29, Dkt. No. 94:22.)  In emails

relating to that issue, FADA Sprague explained to Sgt. DuPell that, based

on her research—which was explained in the emails—she believed that

Barcomb's suspension removed his status as a police officer, thereby

rendering him susceptible to arrest for criminal impersonation based on his

statements to Trooper Murphy. (*See id.* at ¶¶ 24-25.)  In offering this

opinion, FADA Sprague also recommended that Sgt. DuPell "run[] the

issue by [State Police] [D]ivision [C]ounsel and see if their interpretation fits

mine," which Sgt. DuPell did. (*Id.* at ¶¶ 25, 28-29 (internal quotation marks

omitted).)  Ultimately, Dan Moynihan, an attorney in the State Police

Division Counsel's Office, concurred with FADA Sprague's assessment

that probable cause existed to arrest Barcomb. (*See id.* at ¶ 29.)  That

same day, February 15, 2006, Sgt. DuPell relayed Mr. Moynihan's

response, via email, to FADA Sprague and Chief Sabo. (*Id.*)

On March 16, 2006, Trooper Murphy prepared a sworn Information

15

charging Barcomb with second-degree criminal impersonation based on

the January 1 checkpoint stop.  (*See* Murphy Info., Dkt. No. 94:41.)  In the

Information, Trooper Murphy stated that, at the time of the stop, Barcomb

had dilated pupils; stated he was "on the job"; stated he left his badge and

ID at home when he was asked for them; stated he worked for Plattsburgh

State; stated  "I have my Stony Brook ID" and began to show Trooper

Murphy "an ID out of his wallet which looked like a SUNY ID; and stated he

was taking thyroid medication when asked why his pupils were dilated.

(*See id.* at 1.)  The Information further provided that Trooper Murphy did

not conduct a drug recognition evaluation because he believed at the time

that Barcomb was telling him the truth about being a police officer and the

cause of his pupils being dilated.  (*See id.* at 1.)

The Information included a Deposition from Chief Sabo to support the

fact that Barcomb was suspended from the SUNY Plattsburgh Police

Department at the time of the January 1, 2006 checkpoint stop.  (*See id.* at

2.)  The Deposition states, in relevant part:

> On July 29th, 2005 Darren Barcomb was suspended from his
> employment as a University Police [O]fficer at SUNY
> Plattsburgh.  Mr. Barcomb's SUNY Plattsburgh University
> Police Identification (I.D.), his police badge and his duty
> weapon were taken away from him.  As of this date Darren

> Barcomb is still suspended.  He is not employed by any SUNY
> Police agency at this time and has not been employed by any
> SUNY Police agency since his suspension on July 29th, 2005.

(*Id.*)  Prior to submitting her Deposition to Trooper Murphy, Chief Sabo

claims she reviewed it with SUNY Associate Counsel Carolyn Pasley, an

attorney at the SUNY Central Counsel's Office in Albany.  (*See* Defs. SMF

¶ 75, Dkt. No. 94:71.)  Then, Chief Sabo contends, once satisfied that the

Deposition was correct based on her consultation with Ms. Pasely, she

signed it and provided it to Trooper Murphy.  (*See id.* at ¶ 76.)  Barcomb

disputes that Ms. Pasely reviewed Chief Sabo's Deposition.

In addition to Sgt. DuPell's communications with FADA Sprague, it

appears that Trooper Murphy was also in contact with Clinton County

Assistant District Attorney (ADA) Timothy Blatchley regarding the potential

for charging Barcomb based on his representations.  (*See* Defs. Resp.

SMF ¶ 82, Dkt. No. 112:2.)  More specifically, providing ADA Blatchley with

the sworn Information, among other documents, Trooper Murphy appears

to have sought an opinion as to whether there was probable cause to

charge Barcomb with criminal impersonation.  (*See* Blatchley Dep. at 22,

Dkt. No. 103:4.)  Based on a review of the statute and a discussion with

fellow ADA Ed Narrow, ADA Blatchley, along with ADA Narrow, "concluded

that [the charge] didn't fit," and informed Trooper Murphy of that

conclusion.  (*Id.* at 26.)

On March 21, 2006, Sgt. DuPell sent an email to ADA Blatchley

regarding his communications with Trooper Murphy.  (*See* DuPell Decl. ¶

32, Dkt. No. 94:22.)  According to Sgt. DuPell, she had learned from

Trooper Murphy that after FADA Sprague and DA Wylie had already given

their opinion that there was probable cause to arrest Barcomb for criminal

impersonation, Trooper Murphy spoke with ADA Blatchley about the case

and received a contrary opinion.  (*See id.*)  Sgt. DuPell contends she

contacted ADA Blatchley to "make sure that he was aware of the previous

dealings that I had with the DA's Office on the issue."  (*Id.* at ¶ 33.)  Along

that line, Sgt. DuPell included in her email a copy of her prior

correspondence with FADA Sprague, which indicated a willingness to

proceed with charging Barcomb.  (*See id.* at ¶ 32.)  In response to her

email, Sgt. DuPell received a voicemail message from ADA Blachley,

essentially stating that there was a dispute among the attorneys in the

Clinton County DA's office as to whether to proceed with the arrest and

prosecution of Barcomb, and that Sgt. DuPell should not do anything until

DA Wylie made the final decision.  (*See id.* at ¶ 34.)  Ultimately, on March

31, Sgt. DuPell received the following email message from DA Wylie: "I have been provided the CI 2nd charge against Darren Barcomb for review. I approve the matter for prosecution.  Arrest and get bail set at $1,000/$2,000."  (Mar. 31 Wylie Email, Dkt. No. 94:34.)

After Sgt. DuPell informed Trooper Murphy of DA Wylie's decision, Trooper Murphy filed the charging documents—i.e., the sworn Information and Chief Sabo's deposition—with the Town of Plattsburgh Court.  (*See* Pl. Counter SMF ¶ 97-98, Dkt. No. 109.)  Then, on April 4, 2006, after reviewing the charging documents, Town Judge Kevin M. Patnode issued a warrant for the arrest of Barcomb on the second-degree criminal impersonation charge.  (*See* Defs. SMF ¶ 87, Dkt. No. 94:71)  Pursuant to that warrant, Barcomb was arrested by the New York State Police on April 18, 2006.  (*See* Defs. Mem. of Law at 17, Dkt. No. 94:72.)

On June 8, 2006, Barcomb moved to dismiss the charge based on "exculpatory evidence" from his personnel file; namely, SUNY Plattsburgh Human Resources documents stating that he technically remained employed by SUNY Plattsburgh as "Police Officer I" during his

suspension.[6]  (*See* Defs. SMF ¶ 88, Dkt. No. 94:71; State Mot. to Dismiss, Dkt. No. 94:67.)  After reviewing these materials and the parties' competing arguments, Judge Patnode denied Barcomb's motion, finding that while Barcomb remained "employed" by SUNY Plattsburgh, he "ha[d] not been 'on the job' since his suspension."  (*See* Defs. SMF ¶ 88, Dkt. No. 94:71; Judge Patnode Ruling, Dkt. No. 94:69.)  Ultimately, however, in light of an apparent conflict of interest between a member of the Clinton County District Attorney's Office and the defense, the charge against Barcomb was dismissed without prejudice and was never refiled.  (*See* Am. Compl. ¶ 36, Dkt. No. 19.)

## C.  Procedural History

On August 28, 2007, Barcomb commenced the current action against Chief Sabo, Assistant Chief Lottie, and Trooper Murphy, among others, alleging claims for false arrest, malicious prosecution, unreasonable seizure, unlawful retaliation, due process violations, and failure to

---

[6]Sgt. Dupell, Trooper Murphy, and Chief Sabo claim to have had "absolutely no knowledge of [these or other similar] documents in Barcomb's personnel file" until after the initiation of this lawsuit.  (*See* Defs. SMF ¶¶ 84-85, Dkt. No. 94:71.)  Had they been made aware of the documents, they assert, "they would have certainly brought them to the attention of the attorneys at the DA's Office and/or the New York State Police Division Counsel's Office, and they would have taken any advice that they might have provided as to whether there was sufficient reason in those documents to not proceed with a prosecution of the case."  (*Id.* at ¶ 86.)

supervise.  (*See* Compl., Dkt. No. 1; Am. Compl., Dkt. No. 19.)

On May 20, 2010, defendants moved for summary judgment, seeking

dismissal of Barcomb's claims and asserting qualified immunity. (*See* Dkt.

No. 94.)

### III.  Standard of Review

The standard for the grant of summary judgment is well established

and will not be repeated here.  For a full discussion of the standard, the

court refers the parties to its previous opinion in *Bain v. Town of Argyle,*

499 F. Supp. 2d 192, 194-95 (N.D.N.Y. 2007).

### IV.  Discussion

Barcomb has agreed to discontinue his fourth, fifth, and sixth causes

of action, which assert claims for substantive and procedural due process

violations, First Amendment retaliation, and failure to supervise.  (*See* Pl.

Mem. of Law at 1 n.1, Dkt. No. 110; Nov. 12, 2010 Stipulation & Order of

Discontinuance, Dkt. No. 116.)  Accordingly, those causes of action are

dismissed.

Barcomb's remaining first, second, and third causes of action against

Chief Sabo, Assistant Chief Lottie, and Trooper Murphy assert Fourth

Amendment claims for false arrest, "unreasonable seizure," and malicious

prosecution.  The court now turns to those claims.

## A.   **False Arrest and Malicious Prosecution**

A claim for false arrest or imprisonment brought pursuant to § 1983 "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause."  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citation omitted).  To establish a false arrest claim under either federal or New York law, a plaintiff must demonstrate that: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged."  *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (internal quotation marks and citations omitted).

"An arrest is justified, or otherwise privileged, if there was probable cause to arrest."  *Sulkowska v. City of New York*, 129 F. Supp. 2d 274, 287 (S.D.N.Y. 2001) (citations omitted).  In other words, "the existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest."  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal quotation marks and citation omitted).  "Thus, a claim for false arrest must fail if probable cause to arrest existed."  *Martinetti v. Town*

*of New Hartford Police*, 112 F. Supp. 2d 251, 252 (N.D.N.Y. 2000) (citation omitted).

"Probable cause exists when an officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (internal quotation marks and citation omitted). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citation omitted). Importantly though, an "officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Id.* at 153 (citing, inter alia, *Whren v. United States*, 517 U.S. 806, 812-13 (1996)). Instead, an arrest is lawful "as long as the circumstances, viewed objectively, justify that action." *Id.* (internal quotation marks and citation omitted).

Along these lines, "[a]n arrest pursuant to a valid warrant is presumptively made with probable cause." *Martinetti*, 112 F. Supp. 2d at 252-53 (citation omitted). This presumption "can be rebutted only by a showing of fraud, perjury, or the misrepresentation or falsification of evidence." *Id.* at 253

(citation and internal quotations omitted).  Ultimately, "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial if the facts are in dispute."  *Weyant*, 101 F.3d at 852 (citations omitted).

With respect to claims for malicious prosecution, a plaintiff must establish that: "(1) the defendant commenced a criminal proceeding against him; (2) the proceeding ended in the plaintiff's favor; (3) the defendant did not have probable cause to believe the plaintiff was guilty of the crime charged; and (4) the defendant acted with actual malice."  *Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir. 1994).  And as with false arrest, the existence of probable cause is a complete defense to a malicious prosecution claim.  *See Savino*, 331 F.3d at 72; *see also Lewis v. U.S.*, 388 F. Supp. 2d 190, 195 (S.D.N.Y. 2005).  Probable cause to commence a criminal proceeding exists when a defendant has "knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of."  *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994).

**B.    "False Arrest /Unreasonable Seizure": The June 2005 Events**

In his first cause of action, Barcomb alleges a claim of "False Arrest/Unreasonable Seizure" against Chief Sabo and Assistant Chief Lottie in connection with the events of June 30, 2005; namely, the arrest[7] and transportation of Barcomb from Clinton County to Suffolk County. (Am. Compl. ¶¶ 57-63, Dkt. No. 19.)  More specifically, Barcomb alleges that "[i]t was not objectively reasonable for [Chief Sabo and Assistant Chief Lottie] to arrest and transport him the entire length of the State of New York without complying with the express requirements of New York law, [i.e., N.Y. CRIM. PROC. LAW § 120.90(3),][8] including providing [him] with an opportunity to appear before a local court to be arraigned and released." (Am. Compl. ¶¶ 25, 59, Dkt. No. 19.)  The court agrees with Chief Sabo

---

[7]Defendants concede, for purposes of this motion, that Barcomb was arrested by Chief Sabo and Assistant Chief Lottie before being transported to Suffolk County.  (*See* Defs. Reply at 1, Dkt. No. 112.)

[8]In relevant part, N.Y. CRIM. PROC. LAW § 120.90(3) provides:

Upon arresting a defendant for an offense other than a felony pursuant to a warrant of arrest in a county other than the one in which the warrant is returnable or one adjoining it, a police officer, if he be one to whom the warrant is addressed, must inform the defendant that he has a right to appear before a local criminal court of the county of arrest for the purpose of being released on his own recognizance or having bail fixed. If the defendant does not desire to avail himself of such right, the officer must request him to endorse such fact upon the warrant, and upon such endorsement the officer must without unnecessary delay bring him before the court in which the warrant is returnable. If the defendant does desire to avail himself of such right, or if he refuses to make the aforementioned endorsement, the officer must without unnecessary delay bring him before a local criminal court of the county of arrest.

25

and Assistant Chief Lottie that this cause of action must be dismissed.

At the threshold, "it is not the province of the Fourth Amendment to enforce state law." *Virginia v. Moore*, 553 U.S. 164, 178 (2008). "Whether or not [conduct] is reasonable within the meaning of the Fourth Amendment ... has never depended on the law of the particular State in which the [conduct] occurs." *Id.* at 172 (citations and internal quotation marks omitted); *see also Watson v. City of New York*, 92 F.3d 31, 37-38 (2d Cir. 1996) ("Ample precedent establishes that a state rule of criminal procedure ... does not create a liberty interest that is entitled to protection under the federal Constitution."). Thus, while Barcomb may have been deprived of his state procedural right to be arraigned locally, that deprivation alone does not entitle him to relief under the Fourth Amendment. *See Watson*, 92 F.3d 31, 37-38 (explaining that the specific arraignment requirements of New York State procedural law were irrelevant to whether the delay in plaintiff's arraignment infringed her Fourth and Fourteenth Amendment rights); *see also Young v. Cnty. of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998) ("Without more, the fact that defendants violated New York procedural requirements does not support liability under § 1983."); *Robinson v. Via*, 821 F.2d 913, 922-23 (2d Cir. 1987) ("[A]

violation of state law neither gives [rise to] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim." (citations omitted)).  Rather, to succeed on his Fourth Amendment claim, Barcomb must show that he was deprived of a clearly-established Fourth Amendment right when he was arrested and transported to the county that issued the warrant for his arrest.  Barcomb cannot make this showing.

As explained above, the existence of probable cause, which is a "complete defense" to an action for false arrest or wrongful imprisonment, *Weyant*, 101 F.3d at 852, is presumed where an arrest is made pursuant to a valid arrest warrant, *Martinetti*, 112 F. Supp. 2d at 252.  Thus, unless it can be shown that the warrant was obtained using fraud, perjury, or the misrepresentation or falsification of evidence, a claim for false arrest or wrongful imprisonment must fail.  *See Katz v. Morgenthau*, 709 F. Supp. 1219, 1229 (S.D.N.Y. 1989) ("No civil action is available to plaintiff under Section 1983 for an arrest and subsequent detention made pursuant to a valid arrest warrant." (citing *Baker v. McCollan*, 443 U.S. 137, 145 (1979)). In this case, Barcomb does not dispute that he was arrested, detained and transported to Suffolk County pursuant to a valid arrest warrant, (*see* Pl. Resp. Mem. of Law at 1, 12, Dkt. No. 110), and does not allege the

existence of fraud, perjury, or the misrepresentation or falsification of evidence in obtaining that warrant.  Accordingly, because probable cause to arrest and detain Barcomb clearly existed, his claim for "false arrest/unreasonable seizure" is dismissed.[9]

In an effort to salvage his claim, Barcomb appears to argue that while his arrest and detention were justified at their inception, his Fourth Amendment right to be free from unreasonable seizure was nonetheless violated because he was deprived of  the opportunity to be arraigned locally.  (*See* Pl. Resp. Mem. of Law at 12-14, Dkt. No. 110.)  However, even if the court were to credit the contention that Barcomb, an individual arrested and detained pursuant to a valid warrant, had a Fourth Amendment right to a local and more expeditious arraignment, his claim would nonetheless fail on qualified immunity grounds.

"The doctrine of qualified immunity shields government officials from liability for civil damages when their conduct does not violate 'clearly

---

[9]While Barcomb alleges that Chief Sabo and Assistant Chief Lottie's actions in arresting and transporting him to Suffolk County "were motivated by bad faith and malice," (Am. Compl. ¶ 61, Dkt. No. 19), that allegation, even if true, is "constitutionally irrelevant [since] the seizure [was] supported by probable cause."  *Turkmen v. Ashcroft*, 589 F.3d 542, 549 (2d Cir. 2009); *see also Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005) ("The subjective motivations of the individual officers have no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment." (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

established statutory or constitutional rights of which a reasonable person would have known.'" *African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 359 (2d Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A right is "clearly established" if: "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) (citation and internal quotation marks omitted.)

In this case, Barcomb has pointed to no Supreme Court or Second Circuit authority clearly establishing the right now asserted, or to any other pre-existing law sufficient to give defendants "fair warning" that their conduct in transporting Barcomb to the warrant-issuing county and depriving him of a local arraignment would violate federal law.[10]  Rather, in

---

[10]To the extent Barcomb relies on the Supreme Court's holdings in *Gerstein v. Pugh,* 420 U.S. 103 (1975), and *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991), for the proposition that the Fourth Amendment clearly entitled him to an "arraignment without unreasonable delay," (*see, e.g.*, Pl. Resp. Mem. of Law at 12, Dkt. No. 110), that reliance is misplaced.  The delay addressed by the Court in those case was pre-arraignment delay in the context of *warrantless* arrests.  Under those circumstances, that Court held that an arrestee was entitled to "a [prompt] judicial determination of probable cause," *Gerstein*, 420 U.S. at 125, and set forty-eight hours as the presumptive outside limit for confinement prior to arraignment, *McLaughlin*, 500 U.S. at 56.  In this case, Barcomb was arrested pursuant to a valid warrant based on a *prior* judicial determination of probable case, thereby satisfying the Fourth Amendment's "prompt arraignment requirement" and obviating the need for a post-arrest probable cause determination.  *Gerstein*, 420 U.S. at 125 ("[The] determination must be made

a passing attempt to avoid dismissal on qualified immunity grounds,

Barcomb asserts only that the rights of an arrestee "to be free from

unreasonable seizures under the Fourth Amendment, and ... to due

process ... were firmly established at the time [he] was taken into custody."

(Pl. Resp. Mem of Law at 14, Dkt. No. 110.)  As this court has made clear

in the past, however, "[such a] generalized observation does not control."

*Reinhart v. City of Schenectady Police Dep't*, 599 F. Supp. 2d 323, 336

(N.D.N.Y. 2009).  Rather, "the question is whether the law was clearly

established in a more particularized sense ... [such] that a reasonable

official would have understood that what [he] was doing violated the law."

*Id.* (citation omitted).  And given the dearth of authority cited in that respect,

the court must answer that question in the negative.  Accordingly, for this

reason and the reasons discussed above, Barcomb's first cause of action

is dismissed.

## C.   False Arrest and Malicious Prosecution: The 2006 Events

---

*either before or promptly after arrest.*" (emphasis added)); *Baker v. McCollan*, 443 U.S. 137, 143 (1979) (explaining that "a person arrested pursuant to a warrant issued by a magistrate on a showing of probable-cause is not constitutionally entitled to a separate judicial determination that there is probable cause to detain him pending trial").  Thus, the court declines Barcomb's implicit invitation to hold that the Fourth Amendment's "prompt arraignment requirement," which targets *warrantless* arrests, would have signaled to Chief Sabo and Assistant Chief Lottie that their conduct in depriving Barcomb of a local and more expeditious arraignment and release would violate federal law.

In his remaining second and third causes of action, Barcomb asserts claims of false arrest and malicious prosecution against Trooper Murphy, Chief Sabo, and Assistant Chief Lottie in connection with his 2006 arrest and prosecution for misdemeanor criminal impersonation in the second degree.  (*See* Am. Compl. ¶¶ 64-81, Dkt. No. 19.)  As an initial matter, these causes of action are dismissed as against Assistant Chief Lottie because there is no evidence to suggest that he played any role in obtaining the arrest warrant or in prosecuting Barcomb for second-degree criminal impersonation, a fact that Barcomb does not appear to dispute. *See Scott v. Fisher*, 616 F.3d 100, 110 (2d Cir. 2010) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [§] 1983." (citation and internal quotation marks omitted)).

The remaining defendants, Trooper Murphy and Chief Sabo, argue that they are entitled to qualified immunity because there was probable cause, or at least "arguable probable cause," to support Barcomb's arrest and subsequent prosecution.  (*See* Defs. Mem. of Law at 13-14, Dkt. No. 94:72.)

As explained above, the existence of probable cause is a complete

31

defense to actions for false arrest and malicious prosecution.  *See Weyant*, 101 F.3d at 852; *Savino*, 331 F.3d at 72.  And again, "[p]robable cause exists when an officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  *Savino*, 331 F.3d at 76 (internal quotation marks and citation omitted).  But "[e]ven if probable cause to arrest [or charge] is ultimately found not to have existed, an arresting [or charging] officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest [or charge]."  *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004); *see also Reinhart*, 599 F. Supp. 2d at 335-36.  Arguable probable cause exists where "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."  *Escalera*, 361 F.3d at 743 (citations and internal quotation marks omitted).  Thus, this "analytically distinct test for qualified immunity is more favorable to ... officers than the one for probable cause," *id.*, as it shields them from § 1983 liability unless their "judgment was so flawed that no reasonable officer would have made a similar choice," *see Lennon v.*

*Miller*, 66 F.3d 416, 424-25 (2d Cir. 1995) (citation omitted).  Whether

arguable probable cause exists may be determined as a matter of law "if

there is no dispute as to the material historical facts."  *Zellner v. Summerlin*,

494 F.3d 344, 368 (2d Cir. 2007) (citations omitted).  But "[e]ven where

factual disputes exist, a § 1983 claim may fail if the plaintiff's version of

events is sufficient to establish probable cause."  *McZorn v. Endicott Police*

*Dep't*, No. 3:06-CV-0033, 2008 WL 163581, at *7 (N.D.N.Y. Jan. 16, 2008).


     In this case, Barcomb was arrested for and charged with

misdemeanor criminal impersonation in the second degree, a violation of

N.Y. PENAL LAW § 190.25(3).  As set forth above, the statute provides that:

> A person is guilty of criminal impersonation in the second
> degree when he... (a) [p]retends to be a public servant, ... or
> falsely expresses by his words or actions that he is a public
> servant or is acting with approval or authority of a public agency
> or department; and (b) so acts with intent to ... cause another to
> act in reliance upon that pretense.

N.Y. PENAL LAW § 190.25(3).  Therefore, in assessing whether

Trooper Murphy and Chief Sabo are entitled to summary judgment on

Barcomb's false arrest and malicious prosecution claims, the court must

determine whether, based on the undisputed facts viewed in a light most

favorable to Barcomb, there was, as of April 18, 2006,[11] probable cause or

arguable probable cause to believe that Barcomb had violated this statute.

 With respect to Trooper Murphy, the court concludes that even when

limiting review of the record to Barcomb's version of events, he is entitled

to qualified immunity.  As recounted above, the encounter that later gave

rise to Barcomb's arrest occurred during the early morning hours at a

sobriety checkpoint when Trooper Murphy stopped Barcomb's vehicle.

According to Barcomb, Trooper Murphy told Barcomb that his "eyes looked

a little funny to him," and asked Barcomb whether he was taking any

medications.  Barcomb responded that he "was on thyroid medicine."

Then, when Trooper Murphy told Barcomb that he was going to administer

the "Horizontal Gaze Nystagmus" test, Barcomb responded, according to

him, "I understand how it works, I have been a cop for six years."

According to Barcomb, this statement prompted Trooper Murphy to ask

Barcomb where he worked and whether he had any identification or a

_____

[11]As the parties acknowledge, probable cause is measured at the time of arrest with respect to false arrest claims, and at the time the criminal action was commenced with respect to malicious prosecution claims.  *See Reinhart v. City of Schenectady Police Dep't*, 599 F. Supp. 2d 323, 328 (N.D.N.Y. 2009).  In this case, however, because the factual predicates for the probable cause remained unchanged from the date the Information was filed—a date not provided in the parties' submissions—and April 18, 2006, the date Barcomb was arrested and deprived of his liberty, the court will use that date, April 18, as the outside controlling date for purposes of determining whether there was reason to believe that Barcomb committed the crime charged.

badge.  Barcomb claims he told Trooper Murphy that he worked "at SUNY Plattsburgh, but I have spent some time at SUNY Stony [B]rook," and, with respect to his ID and badge, he claims he stated: "I don't have any. I'm out of work at the moment."  It is undisputed that Trooper Murphy later learned from Chief Sabo, prior to Barcomb's arrest, that Barcomb was suspended from the SUNY Plattsburgh Police Department when he made these statements.

Based on these facts, Trooper Murphy had at least arguable probable cause to believe that Barcomb violated § 190.25(3) of the New York Penal Law.  In the court's view, because Barcomb's initial volunteered statement that he "[has] been a cop for six years" could reasonably be construed to convey that he was currently an active police officer, the court cannot say that officers of reasonable competence could not disagree as to whether that statement alone, in light of Barcomb's suspension, amounted to conduct proscribed under § 190.25(3).  *See New York v. Epperson*, 179 A.D.2d 92, 94-95 (1st Dep't 1992) (holding that police officer suspended but not finally terminated "was no longer entitled to enjoy the privileges of his profession" and "was not authorized to act as a police officer"), *aff'd*, 82 N.Y.2d 697 (N.Y. 1993).  And while Barcomb focuses much of his

opposition on his claim that he told Trooper Murphy he was "out of work"—apparently to demonstrate that he did not *intend* to falsely represent himself as an active police officer—that claim, even if true, does not negate the reasonableness of Trooper Murphy's probable cause assessment.  *See McGuire v. City of New York*, 142 F. App'x 1, 3 (2d Cir. 2005) ("[W]hen an officer has evidence that a defendant has engaged in conduct proscribed by law ... he has probable cause to arrest the person even without specific evidence on the elements of knowledge and intent that will have to be proved to secure a conviction at trial." (citations omitted)).  This is especially so since Barcomb's state of mind could have been reasonably inferred from the "implications of the information known to [Trooper Murphy]."  *Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir. 1989) (citation omitted).  Indeed, given the context in which the encounter occurred—a sobriety checkpoint—the fact that Barcomb made a statement strongly suggesting he was currently an active police officer, only to somewhat qualify that statement upon further questioning, and the fact that the administration of a sobriety test appeared, at the time, imminently forthcoming, Trooper Murphy had a reasonable basis to conclude that Barcomb attempted to use his status as a police officer to gain favorable

treatment from him.  Accordingly, because the court discerns no basis

upon which a reasonable jury could conclude that Trooper Murphy's

"judgment [as to probable cause] was so flawed that no reasonable officer

would have made a similar choice," *see Lennon*, 66 F.3d at 424-25 (citation

omitted), Trooper Murphy is entitled to qualified immunity with respect to

Barcomb's second and third causes of action.

Chief Sabo is also entitled to judgment on Barcomb's second and

third causes of action.  It is undisputed that prior to submitting her

Deposition to Trooper Murphy, Chief Sabo had learned from Tooper

Murphy and Sgt. DuPell that Barcomb was stopped at a sobriety

checkpoint; that he had dilated pupils; that he said he was "on the job"; that

he showed a SUNY Stony Brook ID; and that he said his badge and ID

were left at home.  It is also undisputed that Chief Sabo was aware that

Barcomb was suspended without pay from the SUNY Plattsburgh Police

Department when this encounter occurred.  Because these facts provide a

reasonable basis to conclude that Barcomb held himself out as an active

police officer, they provide probable cause to believe that Barcomb

engaged in conduct proscribed under § 190.25(3) of the New York Penal

Law.  *See Epperson*, 179 A.D.2d at 94-95.  And like Trooper Murphy, Chief

Sabo also had at her disposal sufficient information from which to reasonably infer the requisite intent.  More specifically, the context in which the encounter occurred—a sobriety checkpoint—and Chief Sabo's reasonable belief that Barcomb had dilated pupils, displayed a SUNY ID, and told Trooper Murphy he was "on the job" and "[has] been a cop for six years" are all circumstances from which Chief Sabo could have reasonably inferred that Barcomb, in holding himself out as active police officer, was intending to induce Trooper Murphy to treat him more leniently than he otherwise would have.  Accordingly, Chief Sabo clearly possessed information and knowledge sufficient to justify the reasonable belief that Barcomb violated § 190.25(3) of the New York Penal Law.  And even if the court were wrong in this regard and the probable cause test was not met, Barcomb's claims against Chief Sabo would nonetheless be subject to dismissal since the court cannot say, based on the undisputed facts before it, that no officers of reasonable competence could disagree as to that conclusion.

In an attempt to save his claims against Chief Sabo, Barcomb appears to argue that probable cause is lacking and qualified immunity forfeited because Chief Sabo knew or should have known that Barcomb

remained technically "employed" with the SUNY Plattsburgh Police Department during his suspension, but failed to convey that information to the State Police or prosecutors.  (*See* Pl. Resp. Mem. of Law at 18-22, Dkt. No. 110.)  The court disagrees.

First, contrary to Barcomb's assertions, the fact that Barcomb remained employed during his suspension—a fact necessarily implied by his "suspended" status—does not alter the conclusion that his conduct in arguably representing himself as a police officer could have reasonably been viewed as proscribed under § 190.25(3).  *See Epperson*, 179 A.D.2d at 93-95 (explaining that a suspended police officer, though not "finally terminated," was nonetheless "[un]authorized to act as a police officer" where, by virtue of his suspension, he was "prohibited from performing assigned duties" and was required "to surrender his [ID, badge, and firearm]").  Second, even after examining the charge against Barcomb in light of Barcomb's "employed" status, Judge Patnode, the warrant-issuing judge, found that probable cause remained in tact and therefore denied Barcomb's motion to dismiss.  (*See* Judge Patnode Ruling, Dkt. No. 94:69 (finding that while Barcomb remained "employed" by SUNY Plattsburgh, he "ha[d] not been 'on the job' since his suspension"); *see also Velardi v.*

*Walsh*, 40 F.3d 569, 574 (2d Cir. 1994) (explaining that where there exists "no genuine dispute that a magistrate would have issued the warrant on the basis of the 'corrected affidavits,' then under the ordinary standard for summary judgment, a qualified immunity defense must be upheld." ( citation and emphasis omitted).)  And third, while Barcomb's official employment status may be relevant to the ultimate inquiry of whether he acted with the requisite intent, it does not, as Barcomb contends, "void" probable cause or defeat Chief Sabo's entitlement to qualified immunity. *See McGuire*, 142 F. App'x at 3; *Krause*, 887 F.2d at 371.  Indeed, as discussed above, Chief Sabo had sufficient information from which to infer Barcomb's intent, even considering the employment status information, and Barcomb offers no facts to demonstrate that Chief Sabo was aware of any fact that would definitively compel a contrary conclusion.

Accordingly, for the reasons discussed above, Barcomb's second and third causes of action are also dismissed as against Chief Sabo.

## V. <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Barcomb's fourth, fifth, and sixth causes of action are **DISMISSED**; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No.

94) is **GRANTED** and Barcomb's first, second, and third causes of action

are **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this

Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

May 6, 2011
Albany, New York

Gary L. Sharpe
U.S. District Judge